# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

(Filed: May 14, 2008)

DO NOT PUBLISH



FILED
MAY 1 4 2008
OSM
U.S. COURT OF
FEDERAL CLAIMS

| | |
|---|---|
| ALICE WACHOL, )<br>as next friend of her son, )<br>NICHOLAS WACHOL, )<br>                                    )<br>            Petitioner, )<br>                                    )<br>v.                                 )<br>                                    )<br>SECRETARY OF           )<br>HEALTH AND HUMAN SERVICES, )<br>                                    )<br>            Respondent. )<br>                                    ) | No. 07-0093V<br>Autism; Statute of Limitations;<br>*Markovich*; Dismissal |

## DECISION[1]

Petitioner, Alice Wachol (Ms. Wachol), as next friend of her son, Nicholas Wachol (Nicholas), seeks compensation under the National Vaccine Injury Compensation Program (Program).[2] *See generally* Short Form Autism Petition for Vaccine Compensation (Pet.). Ms. Wachol filed her Program petition on February 8, 2007. *See* Pet. Ms. Wachol alleges that Nicholas "suffers from development delays and mental and physical injuries," Pet. ¶ 15, specifically "Autism." Pet. ¶¶ 12, 14. Ms. Wachol relates Nicholas's condition to "vaccine poisoning," Pet. ¶ 15, from diphtheria-pertussis-tetanus (DPT) vaccine and measles-mumps-rubella (MMR) vaccine. *See* Pet. ¶ 12.

---

[1] As provided by Vaccine Rule 18(b), each party has 14 days within which to request redaction "of any information furnished by that party (1) that is trade secret or commercial or financial information and is privileged or confidential, or (2) that are medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, "the entire decision" will be available to the public. *Id.*

[2] The statutory provisions governing the Vaccine Program are found in 42 U.S.C. §§ 300aa-10 *et seq.* For convenience, further reference will be to the relevant section of 42 U.S.C.

BACKGROUND

Nicholas was born at 11:00 a.m., on March 5, 2002, at William Beaumont Hospital in Royal Oak, Michigan. *See* Petitioner's exhibit (Pet. ex.) 2 at 10. He weighed eight pounds, 14 ounces. *See* Pet. ex. 2 at 6. He measured 21 inches in length. *See id.* His APGAR scores were nine at one minute and nine at five minutes. *See id.*[3]

As an infant, Nicholas received periodic medical attention from physicians associated with Bloomfield Pediatric Care, in Bloomfield Hills, Michigan. *See generally* Pet. ex. 6 at 50-71. Except for regularly-scheduled physical examinations and typical childhood illnesses, Nicholas's early medical history is not remarkable. *See generally id.* Medical personnel from Bloomfield Pediatric Care administered to Nicholas a full complement of routine childhood vaccinations, including a Hepatitis B vaccination on March 15, 2002; a Hepatitis B vaccination on April 24, 2002; a diphtheria-tetanus-acellular pertussis (DTaP) vaccination, a hemophilus influenza type-b (Hib) vaccination, inactivated polio vaccine (IPV), and a pneumococcal conjugate (Prevnar) vaccination on May 8, 2002; a DTaP vaccination, a Hib vaccination, IPV and a Prevnar vaccination on July 8, 2002; a DTaP vaccination, a Hib vaccination, and a Prevnar vaccination on September 13, 2002; a Hepatitis B vaccination on February 3, 2003; a varicella vaccination and a Prevnar vaccination on April 3, 2003; and a Hib vaccination and an MMR immunization on June 9, 2003. *See* Pet. ex. 6 at 6.

Beginning in June 2003, physicians associated with Bloomfield Pediatric Care, and Leonard P. LaCivita, M.D. (Dr. LaCivita), an ear, nose and throat (ENT) specialist, monitored Nicholas's speech and language development. *See, e.g.*, Pet. ex. 6 at 49 (6/9/2003: physician planned to "watch speech development" and refer Nicholas to Dr. LaCivita); Pet. ex. 6 at 48 (7/11/2003: Dr. LaCivita determined that Nicholas's "language development" was "really behind," particularly when comparing Nicholas's language development to a younger sibling's language development. Dr. LaCivita posited that "a history of recurrent infections" contributed to Nicholas's speech/language delay.); Pet. ex. 6 at 44 (10/11/2003: noting that Nicholas was "not talking much," physician planned to "reassess" Nicholas's "speech" in two months).[4] On December 26, 2003, Nicholas presented to a physician at Bloomfield Pediatric Care for another evaluation of his "speech development." Pet. ex. 6 at 43. The physician understood that Nicholas had "lost some words that he had previously." *Id.* Upon examining Nicholas, the physician observed that Nicholas maintained "poor eye contact." *Id.* In addition, the physician appreciated "very few words." *Id.* The physician

---

[3] An APGAR score is a numerical expression of the condition of a newborn infant, usually determined at 60 seconds after birth, being the sum of points gained on assessment of the heart rate, respiratory effort, muscle tone, reflex irritability, and color. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1670 (30th ed. 2003).

[4] On October 11, 2003, medical personnel from Bloomfield Pediatric Care administered to Nicholas a DTaP vaccination, IPV, and an influenza vaccination. *See* Pet. ex. 6 at 6.

suspected "'autistic behavior' [at] times." *Id.* The physician referred Nicholas for "speech t[reatment]." *Id.*

On January 26, 2004, Ms. Wachol executed a release, directing the disclosure of Nicholas's medical records to Richard Solomon, M.D. (Dr. Solomon), Section Chief and Clinical Associate Professor at the University of Michigan Medical Center, C.S. Mott Children's Hospital Development and Behavioral Pediatrics Clinic, in anticipation of a "[d]evelopmental assessment." Pet. ex. 6 at 37.

Nicholas presented to Dr. Solomon on February 13, 2004. *See* Pet. ex. 19-21. According to Dr. Solomon, Nicholas's parents were "worried about a possibility [of] autistic spectrum disorder." Pet. ex. 6 at 19. Dr. Solomon indicated that Nicholas's parents reported that Nicholas exhibited "language delays, some difficulties, though not severe[,] with social skills and some repetitive interests." *Id.*; *see also* Pet. ex. 6 at 38 (1/13/2004: Nicholas's parents confirm that "within the home environment," Nicholas displayed "reduced joint attention and impulsivity with fleeting eye contact during structured activities"). After considering Nicholas's "significant" medical "history," and after observing Nicholas "in the office setting," Dr. Solomon concluded that Nicholas suffered "a very mild form of autism." Pet. ex. 6 at 20. Dr. Solomon advised "intensive behavioral interventions." *Id.* Dr. Solomon labeled Nicholas's "prognosis" as "excellent." *Id.*

## DISCUSSION

The United States is sovereign, and no one may sue the United States without the sovereign's waiver of immunity. *See United States v. Sherwood*, 312 U.S. 584, 586 (1941). The Program represents a waiver of sovereign immunity. *See, e.g., Markovich v. Secretary of HHS*, 477 F.3d 1353, 1360 (Fed. Cir. 2007), citing *Brice v. Secretary of HHS*, 240 F.3d 1367, 1370 (Fed. Cir. 2001), *cert. denied*, 534 U.S. 1040 (2001). Therefore, the special master must construe "strictly and narrowly" Program provisions. *Markovich*, 477 F.3d at 1360.

A statute of limitations is a jurisdictional condition to the waiver of sovereign immunity. *See United States v. Mottaz*, 476 U.S. 834, 841 (1986); *see also J.R. Sand & Gravel Co. v. United States*, 552 U.S. –, 128 S.Ct. 750 (2008). The statutory limitations period governing Ms. Wachol's petition is contained in § 300aa-16(a)(2). Under § 300aa-16(a)(2), a petitioner seeking compensation related to an injury associated with a vaccine administered after October 1, 1988, may not file a petition "after the expiration of 36 months after the date of the occurrence of the first symptom or manifestation of onset" of the injury. In *Markovich*, the United States Court of Appeals for the Federal Circuit (Federal Circuit) accorded different meanings to the word "symptom" and to the phrase "manifestation of onset." *See Markovich*, 477 F.3d at 1357. According to the Federal Circuit, "either a 'symptom' or a 'manifestation of onset' can trigger the running of the statute, whichever is first." *Markovich*, 477 F.3d at 1357. And, according to the Federal Circuit, "'the first symptom or manifestation of onset,' for the purposes of § 300aa-16(a)(2), is the first event objectively recognizable as a sign of" a petitioner's alleged vaccine-related injury "by the medical

profession at large." *Markovich*, 477 F.3d at 1360. Thus, the Federal Circuit confirmed that "Congress intended the limitations period to commence to run prior to the time a petitioner has actual knowledge that the vaccine recipient suffered from an injury that could result in a viable cause of action under the Vaccine Act." *Markovich*, 477 F.3d at 1358.

After examining Nicholas on February 13, 2004, Dr. Solomon diagnosed formally "a very mild form of autism." Pet. ex. 6 at 20. If the limitations period contained in § 300aa-16(a)(2) accrues on the date of diagnosis, five days of the 36-month limitations period provided in § 300aa-16(a)(2) remained when Ms. Wachol filed her Program petition on February 8, 2007. However, § 300aa-16(a)(2) relates specifically the accrual of the limitations period to "the date of the occurrence of the first symptom or manifestation of onset" of a petitioner's putative vaccine injury, rather than to the date of diagnosis. *See, e.g., Markovich*, 477 F. 3d. 1353. Indeed, had Congress intended the limitations period contained in § 300aa-16(a)(2) to accrue upon the date of diagnosis, Congress could have stated that the limitations period contained in § 300aa-16(a)(2) accrues upon the date of diagnosis. Congress did not.

The special master recognizes, of course, that in several *acute* injuries that special masters consider commonly in Program cases, such as anaphylaxis, encephalopathy and severe seizures, "the date of the occurrence of the first symptom or manifestation of onset" of the particular injury coincides frequently with the diagnosis of the particular injury. § 300aa-16(a)(2). Yet, disorders within the autistic spectrum are not *acute* disorders. Physicians rely upon clinical history–evidence of a standing pattern of behavior, *i.e.*, symptoms and manifestations; clinical observation; and, at times, neuropsychological testing, to render a diagnosis of a disorder within the autistic spectrum.

Nicholas's medical records demonstrate that Nicholas exhibited speech and language delay as early as June 2003. *See* Pet. ex. 6 at 49. But, in assessing the timeliness of Ms. Wachol's Program petition, the special master does not have to consider the medical association between Nicholas's speech and language delay in mid-2003 and Nicholas's autism because in December 2003, a physician recorded clearly an impression of "'autistic behavior' [at] times." Pet. ex. 6 at 43. The physician referred quickly Nicholas for additional evaluation. *See id.* On February 13, 2004–less than two months after a physician referred Nicholas for additional evaluation–Dr. Solomon confirmed the physician's impression of autism. *See* Pet. ex. 6 at 19-21.

Given the record in this case, Ms. Wachol simply cannot argue credibly that Nicholas did not suffer the first symptom or manifestation of onset of his autism until February 13, 2004, the date of diagnosis. At the outset, the special master notes that Ms. Wachol is apparently an educated professional. *See, e.g.*, Pet. ex. 6 at 20. Ms. Wachol had to be aware that in December 2003, a physician suspected autism, prompting a referral for a developmental assessment. *See* Pet. ex. 6 at 42. Indeed, in January 2004, Ms. Wachol arranged for Dr. Solomon to receive a copy of Nicholas's medical records in advance of Nicholas's February 13, 2004 appointment with Dr. Solomon. *See* Pet. ex. 6 at 37. Moreover, Ms. Wachol reported to Dr. Solomon that she was "worried about a possibility [of] autistic spectrum disorder." Pet. ex. 6 at 19. It defies credulity to believe that Ms. Wachol's concern that Nicholas exhibited autism arose only on February 13, 2004. *See, e.g.*, Pet.

ex. 6 at 38-41 (1/13/04: Ms. Wachol informed a speech/language pathologist that Nicholas gained, and then lost, vocabulary skills and that Nicholas displayed inconsistent "eye contact").

After canvassing the record as a whole, the special master determines as a matter of fact that Nicholas suffered obviously the first symptom or manifestation of onset of his autism *before* the 36-month period preceding February 8, 2007, the date that Ms. Wachol filed her Program petition. Therefore, the special master rules as a matter of law that § 300aa-16(a)(2) bars Ms. Wachol's Program petition. The special master possesses no authority under any circumstances to waive the limitation period in § 300aa-16(a)(2). *See, e.g., Brice v. Secretary of HHS*, 240 F.3d 1367, 1370 (Fed. Cir. 2001), *cert. denied*, 534 U.S. 1040 (2001)(doctrine of equitable tolling does not apply in Program cases). Indeed, the special master "has no power to do anything but strike the case from [the] docket." *See Johns-Manville Corporation v. U.S.*, 893 F.2d 324, 327 (Fed. Cir. 1989) (citation omitted).

## CONCLUSION

In the absence of a motion for review filed under RCFC Appendix B, the clerk of court shall enter judgment dismissing the petition as barred by the statute of limitations contained in § 300aa-16(a)(2).

The clerk of court shall send Ms. Wachol's copy of this decision to Ms. Wachol by overnight express delivery.

John F. Edwards
Special Master